**Leigh S. BARKER, Katherine S. Stout, Bruce J. Oradei, Ronald Parys, Thomas H. Coenen, and Janet R. Swandby, Plaintiffs,**

v.

**STATE OF WISCONSIN ETHICS BOARD and James E. Doyle, Attorney General of The State of Wisconsin, Defendants.**

No. 93–C–150–C.

United States District Court,
W.D. Wisconsin.

Dec. 13, 1993.

Robert H. Friebert, Friebert Finerty & St. John, S.C., Milwaukee WI, for Leigh S. Barker, Katherine S. Stout, Bruce J. Oradei, Ronald Parys, Thomas H. Coenen, Janet R. Swandby.

Alan Lee, Asst. Atty. Gen., Madison WI, for State of Wisconsin Ethics Bd., James E. Doyle.

## OPINION and ORDER

CRABB, Chief Judge.

Six lobbyists have brought this civil action to contest the constitutionality of a provision in Wisconsin's lobby law, specifically Wis. Stat. § 13.625(1)(b), to the extent that it interferes with their First Amendment right to volunteer unpaid personal services to candidates for elected office. They seek declaratory and injunctive relief pursuant to 42 U.S.C. § 1983. Defendants contend that any statutory interference with plaintiffs' First Amendment rights is justified by the state's interest in preventing corruption and the appearance of corruption in government. In an order granting plaintiffs' motion for a preliminary injunction entered March 12, 1993, I held that plaintiffs had a better than negligible chance of success on their First Amendment claim because it appeared that the statute was not narrowly tailored to serve the state's interest. *Barker v. Wisconsin Ethics Board,* 815 F.Supp. 1216 (W.D.Wis.1993).

Now before the court are the parties' cross-motions for summary judgment on the question whether the prohibition in Wis.Stat. § 13.625(1)(b) is constitutional as directed to voluntary campaign services. That statute provides:

13.625 Prohibited practices. (1) No lobbyist may:

   (b) Furnish to any agency official or legislative employe of the state or to any elective state official or candidate for an elective state office, or to the official's, employe's or candidate's personal campaign committee:

   1. Lodging.

   2. Transportation.

   3. Food, meals, beverages, money or any other thing of pecuniary value, except that a lobbyist may make a campaign contribution to a partisan elective state official or candidate's personal campaign committee; but a lobbyist may make a contribution to which par. (c) applies only as authorized in par. (c).

Paragraph (c) permits a lobbyist to make a monetary contribution to an elective official or candidate for an elective office during a limited period of time and under specified conditions.

The parties agree on the facts and the case raises only questions of law. Summary judgment shall be entered when the

documents on file "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). I conclude that Wis.Stat. § 13.625 is unconstitutional insofar as it prohibits lobbyists from volunteering personal services to political campaigns, because it is not closely drawn to avoid unnecessary abridgment of associational freedoms.

## FACTS

Plaintiffs in this action are licensed lobbyists as defined in Wis.Stat. § 13.62(11), that is, each of them is:

an individual who is employed by a principal, or contracts for or receives economic consideration, other than reimbursement for actual expenses, from a principal and whose duties include lobbying on behalf of the principal. If an individual's duties on behalf of a principal are not limited exclusively to lobbying, the individual is a lobbyist only if he or she makes lobbying communications on each of at least 5 days within a reporting period.

A "lobbying communication" is "an oral or written communication with any agency official, elective state official or legislative employe that attempts to influence legislative or administrative action, unless exempted under s. 13.621." Wis.Stat. § 13.62(10g). A "reporting period" is any six month period beginning with January 1 or July 1. Wis.Stat. § 13.62(12r). Plaintiffs Leigh S. Barker, Katherine S. Stout and Bruce J. Oradei work as consultants for the Wisconsin Educational Association Council. Plaintiff Ronald Parys is employed by the Wisconsin Grocers Association, Inc. Plaintiffs Thomas H. Coenen and Janet R. Swandby are members of Coenen/Swandby Associates, a government relations management firm.

Defendant State of Wisconsin Ethics Board is a state agency created pursuant to Wis.Stat. § 15.62. The ethics board is responsible for administering and enforcing Wisconsin's lobby law, Wis.Stat. §§ 13.61 to 13.75. This responsibility includes issuing interpretive opinions and promulgating administrative rules. Defendant James E. Doyle is Attorney General for the State of Wisconsin and has authority under Wis.Stat. § 13.69(8) to enforce the lobby law with civil and criminal sanctions.

On January 27, 1993, the Ethics Board issued formal opinion OEB 93–3, interpreting Wis.Stat. § 13.625(1)(b) to prohibit a lobbyist from volunteering personal services to a partisan campaign. The Ethics Board opinion states in relevant part:

In essence, [§ 13.625(1)(b)] prohibits a lobbyist from furnishing any thing of pecuniary value to an individual campaigning for partisan elective state office or to a partisan elected office holder except for campaign contributions during particular time periods. A campaign contribution is defined in section 11.01(6), Wisconsin Statutes, to exclude services provided by an individual for a political purpose on behalf of a candidate when the individual is not compensated specifically for such purposes.... Services having pecuniary value would include labor such as delivering campaign literature door to door, stuffing envelopes, constructing yard signs, telephoning citizens on a candidate's behalf, and similar campaign tasks that would require the use of paid labor if individuals did not volunteer.

\* \* \* \* \* \*

The Ethics Board advises that a lobbyist may not furnish personal services to the campaign of an individual running for partisan elective state office if those services are not reportable as a campaign contribution under the campaign finance law and if such services consist of labor for which a campaign would have to pay individuals if they did not volunteer.

On April 6, 1993, the state of Wisconsin held special elections to fill vacancies in the 5th, 23rd and 27th Wisconsin state senate districts and a general spring election to elect a state superintendent of public instruction. Each of the plaintiffs volunteered personal services to one or more of the campaigns for these offices in the April 6, 1993 elections. In addition, each plaintiff wishes to have the opportunity in future elections to volunteer services such as putting up yard signs, delivering brochures, stuffing envel-

opes and making telephone calls on behalf of candidates.

## OPINION

The contested provision in Wis.Stat. § 13.-625(1)(b) provides that no lobbyist may furnish to a candidate for elective office "any other thing of pecuniary value" aside from specified monetary contributions. As interpreted by the ethics board, the prohibition applies to the volunteering of personal services by lobbyists to partisan campaigns. In granting plaintiffs' motion for a preliminary injunction, I concluded that the ethics board's opinion does not conflict with or diverge from the statute because the statute as written includes personal volunteer services; these services can be said to have some pecuniary value, *see Barker,* 815 F.Supp. at 1219, whether they consist of managing an entire campaign or simply handing out campaign literature.

Plaintiffs contend that the statute imposes an unconstitutional burden on their First Amendment rights of association and expression because it is overbroad, that is, not narrowly drawn to advance a compelling state interest. Defendants do not dispute that the statute burdens plaintiffs' First Amendment rights. They contend, however, that the statute should be upheld because it is narrowly drawn to prevent corruption while interfering only marginally with rights under the First Amendment. Before addressing whether the statute is sufficiently narrowly drawn, I must determine the appropriate standard of review.

### Standard of Review

■ There is no question but that § 13.-625(1)(b) implicates a fundamental right: "Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association," which "right was enshrined in the First Amendment of the Bill of Rights." *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1212, 1 L.Ed.2d 1311 (1957). Associational rights include activities pursued in the cause of a campaign for public office. *Elrod v. Burns,* 427 U.S. 347, 370–71, 96 S.Ct. 2673, 2688, 49 L.Ed.2d 547 (1976).

The freedom of political association "is more than the right to attend a meeting; it includes the right to express one's attitudes or philosophies by membership in a group or by affiliation with it...." *Griswold v. Connecticut,* 381 U.S. 479, 483, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965). The United States Supreme Court has long recognized that when government regulates political expression and association, "the importance of First Amendment protections is 'at its zenith.'" *Meyer v. Grant,* 486 U.S. 414, 425, 108 S.Ct. 1886, 1894, 100 L.Ed.2d 425 (1988). The right is not absolute, however, even at its zenith of protection, *see United States Civil Service Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 567, 93 S.Ct. 2880, 2891, 37 L.Ed.2d 796 (1973). An interference with associational rights may be constitutional if the statutory infringement is no broader than it needs to be to accomplish its purpose or, in other words, if it is narrowly tailored. *See, e.g., Austin v. Michigan State Chamber of Commerce,* 494 U.S. 652, 657, 110 S.Ct. 1391, 1396, 108 L.Ed.2d 652 (1990) (citing *Buckley v. Valeo,* 424 U.S. 1, 44–45, 96 S.Ct. 612, 647, 46 L.Ed.2d 659 (1976) (per curiam)).

■ Invoking the United States Supreme Court's opinion in *Buckley,* 424 U.S. 1, 96 S.Ct. 612, plaintiffs assert that the narrowly tailored standard requires this court to employ strict scrutiny to determine whether the state has demonstrated a compelling state interest and employed "means closely drawn to avoid unnecessary abridgment of associational freedoms." *Id.* at 25, 96 S.Ct. at 638 (citing *Cousins v. Wigoda,* 419 U.S. 477, 488, 95 S.Ct. 541, 548, 42 L.Ed.2d 595 (1975); *NAACP v. Button,* 371 U.S. 415, 438, 83 S.Ct. 328, 340–41, 9 L.Ed.2d 405 (1963); and *Shelton v. Tucker,* 364 U.S. 479, 486, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960)). Defendants propose a standard akin to the one applied to time, place and manner restrictions in *Ward v. Rock Against Racism,* 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). They argue that the statute should be upheld "'so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation,'" *Id.* at 799, 109 S.Ct. at 2758 (quoting *United States v. Albertini,* 472 U.S. 675, 689,

105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985). However, this case is not about a time, place or manner restriction. It addresses a direct prohibition on a protected activity, making the *Ward* standard inappropriate.

Defendants also propose that the contested provision warrants a lesser degree of scrutiny, corresponding to that accorded unions, corporations or similar kinds of organizations, because it regulates lobbyists, who threaten the integrity of the political process in a way that ordinary citizens do not. Citing *Federal Election Comm'n v. National Right to Work Comm.*, 459 U.S. 197, 210, 103 S.Ct. 552, 561, 74 L.Ed.2d 364 (1982), defendants assert that the court need not "second guess" the legislature's judgment, because the statute is merely a content-neutral prophylactic rule deserving of the court's deference. In *Federal Election Comm'n*, the Supreme Court accorded "considerable deference" to Congress "to account for the particular legal and economic attributes of corporations and labor organizations." *Id.* at 209, 103 S.Ct. at 560 (upholding Federal Election Campaign Act provision allowing exception to corporate contribution prohibition that permitted certain corporations to solicit only among members for contributions to segregated campaign funds). This case is not about rights of separate legal and economic entities, but rather about rights of individuals, whose legal and economic attributes as citizens and voters do not change by virtue of their trade. Livelihood is not a sufficient factor to warrant less than strict scrutiny to statutes burdening the First Amendment rights of individuals.

In the order granting plaintiffs' motion for a preliminary injunction, *Barker*, 815 F.Supp. 1216, I noted that the appropriate standard to apply was the strict scrutiny standard set forth in *Buckley*. *Id.* at 1221. I stand by this earlier conclusion. In *Buckley*, 424 U.S. 1, 96 S.Ct. 612, the United States Supreme Court considered the constitutionality of various provisions in The Federal Election Campaign Act of 1971, including ceilings on campaign contributions and independent expenditures. Like the provision contested in this case, the election act's provisions were content-neutral: they affected political speech and association but did not discriminate on the basis of viewpoint.[1] The Court applied a "rigorous standard of review" to determine whether the provisions were sufficiently narrowly drawn to effect a compelling state interest. The Court rejected the comparative effectiveness standard that is appropriate for time, place and manner restrictions because the contested provisions imposed "direct quantity restrictions on political communication and association." *Buckley*, 424 U.S. at 18, 96 S.Ct. at 634. Similar to the provisions in *Buckley*, Wisconsin's prohibition against lobbyists' contributing personal services to campaigns has a direct quantitative effect on political communication and association. The Wisconsin provision is even more restrictive than the provisions at issue in *Buckley*. It imposes a total prohibition on a protected activity and not just a partial restriction. Therefore, Wisconsin's prohibition requires a standard of review that is no less exacting than the one required in *Buckley*. This conclusion is compelled by the fact that Wisconsin's lobby law provides criminal sanctions for violations of its provisions. *See Buckley*, 424 U.S. at 41, 96 S.Ct. at 645.

### Narrowly Tailored Analysis
### The state's interest

■ Defendants assert that the state has a compelling interest in avoiding the specter of corruption that would arise from the sight of lobbyists participating in political campaigns. Although the United States Supreme Court has recognized few state interests important enough to justify an infringement of First Amendment rights, one of these is the state interest in preventing government corruption. *Federal Election Comm'n v. National*

---

1. Recently, the Supreme Court characterized a state prohibition against election day campaigning near polling places as content-based and subject to the strictest scrutiny because the statute affected "public discussion of an entire topic," i.e., politics, despite the fact that the statute did not extend to particular viewpoints. *Burson*

*v. Freeman,* —— U.S. ——, ——, 112 S.Ct. 1846, 1850, 119 L.Ed.2d 5 (1992). Arguably the same characterization might apply to political association implicated in Wisconsin's lobby law, but it is not necessary to rely on *Burson* to determine that strict scrutiny is required for this case.

*Conservative Political Action Comm.,* 470 U.S. 480, 496–97, 105 S.Ct. 1459, 1468–69, 84 L.Ed.2d 455 (1985). Preventing the appearance of corruption is equal to the interest in preventing actual corruption; both tend to undermine representative democracy. *Buckley,* 424 U.S. at 26, 96 S.Ct. at 638. The Supreme Court has also recognized a legitimate government interest in regulating lobbyists. *See United States v. Harriss,* 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954) (upholding disclosure law directed at lobbyists for reason that legislators must know whose interests they were being asked to promote).

■ In general, Wisconsin's lobby law reflects the legislature's judgment that, as a class, lobbyists have greater potential to corrupt the political process than do ordinary citizens. The question is whether the state has identified and evaluated the precise interests at stake sufficiently to justify the burdens it has imposed on lobbyists' First Amendment rights. *See, e.g., Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 214, 107 S.Ct. 544, 548, 93 L.Ed.2d 514 (1986) (striking Connecticut statute that required voters in political party primaries to be registered members of that party because state's adduced interests were insufficient to justify the burden on association imposed by the statute).

Ordinarily, the state does not regulate individuals who perform volunteer work in political campaigns. To justify the prohibition at issue, defendants suggest it stems from a heightened concern in the legislature that lobbyists are more motivated than ordinary citizens to gain greater access to candidates or, at least, to gain the appearance of greater access and that lobbyists are also motivated to volunteer personal services as a way of avoiding the limitations on financial contributions. Defendants suggest that public confidence in participatory democracy will be undermined by "legislative campaigns being managed by lobbyists, candidates being driven around by lobbyists, and candidates being given advertising and political advice by lobbyists...."

In *Meyer,* 486 U.S. 414, 108 S.Ct. 1886, the United States Supreme Court addressed similar arguments by the state of Colorado, which was defending a statutory prohibition against using paid circulators to obtain signatures on petitions supporting citizen ballot initiatives. Finding no evidence of actual carelessness or fraud, the Court rejected the state's argument that an interest in compensation might motivate circulators to disregard their duty to verify the authenticity of signatures on the petition any more than a volunteer with an interest in having the proposition placed on the ballot might be so motivated. *Id.* at 426–27, 108 S.Ct. at 1894–95. Defendants' arguments are equally unpersuasive in this case. Without a showing of actual improprieties, allegations of improper motives are not a sufficient justification for a statutory prohibition of a First Amendment right. Defendants have shown no basis for finding that volunteering by lobbyists threatens the integrity of the political process any more than volunteering by other citizens, such as environmental activists, insurance executives, or lawyers, whose volunteering is altogether unregulated because neither Congress nor the state of Wisconsin has seen any need for regulation under ordinary circumstances. These individuals may be just as much in the public eye, may have as much at stake in the legislative process, and may be equally motivated to associate closely with elected public officials, but there is no question that the state cannot interfere with their right to do volunteer work in political campaigns without violating their constitutional rights. I am not prepared to assume that lobbyists are more inclined to interfere with the integrity of the political process than other individuals who are motivated by their various concerns to volunteer to work in political campaigns.

In addition, defendants have failed to demonstrate that the prohibition against lobbyists' volunteering furthers the state's interest in preventing the spectacle of lobbyists associating with political candidates. As defendants note, the statute does not prevent lobbyists from expressing their political views independently of a campaign. For example, lobbyists may allow their names to be used in a candidate's ad, including, conceivably, a billboard or television ad, or they may create

their own ads independently, giving the illusion of close association with a candidate. Moreover, defendants have failed to show that the spectacle of a candidate in close association with a lobbyist would injure the integrity of the political process; if the voters do not like the spectacle, the appearance of close association might as easily injure the candidate's chances for success at the polls.

The Supreme Court has found sufficient justification for a prohibition on volunteering to political campaigns in the case of government workers. *Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880. Upholding the Hatch Act's provisions prohibiting government employees from participating in political campaigns, the Court identified specific government interests that the statute protected, among them, maintaining the integrity of government employment and promotion procedures, assuring "impartial execution of the laws" according to the will of Congress and not politics, and preventing the government work force from building itself into a "powerful, invincible, and perhaps corrupt political machine." *Id.* at 564–67, 93 S.Ct. at 2890–91. Because lobbyists operate outside government structures, they do not present the same risk of mixing governmental and political processes that civil servants present. Lobbyists do not execute the laws, and they do not pass laws. They may influence legislation, but they do so as outsiders to the legislative process. In *Letter Carriers,* the government had extensively documented the dangers of mixing politics and civil service employment over the course of centuries of experience, providing a compelling rationale for a ban on political volunteering in the civil service context. Defendants have presented no such compelling rationale in this case. I agree with the observations of the Supreme Court of California in *Fair Political Practices Comm'n v. Superior Court of Los Angeles County,* 25 Cal.3d 33, 599 P.2d 46, 157 Cal. Rptr. 855 (1979), *cert. denied,* 444 U.S. 1049, 100 S.Ct. 740, 62 L.Ed.2d 736 (1980): "The governmental interests held to warrant substantial restrictions on political rights in *Letter Carriers* have no greater application to lobbyists than to other private campaign contributors." *Id.,* 599 P.2d at 53, 157 Cal.Rptr. at 862 (applying *Buckley,* 424 U.S. 1, 96 S.Ct.

612, to strike down California statute that prohibited lobbyists from contributing to political candidates).

*The Provision*

Besides falling short in their attempts to identify and evaluate the precise interests justifying the burden on lobbyists' First Amendment rights imposed by the prohibition, defendants fail to show that the provision is "closely drawn to avoid unnecessary abridgment of associational freedoms." *Buckley,* 424 U.S. at 25, 96 S.Ct. at 638. As an initial concern, the definition of lobbyist is a broad one. The statute does not limit its reach to lobbyists whose activities are more likely to threaten the integrity of the political process. Under Wisconsin law, a "lobbyist" is any person "employed by a principal ... who makes lobbying communications on each of at least 5 days within a reporting period" of 6 months. Wis.Stat. § 13.62(11)–(12). Plaintiffs contend that the targeted population is overly broad because it takes fewer than one lobbying communication a month to transform an ordinary citizen into a "lobbyist" under Wisconsin law. Plaintiffs also contend that the provision does not discriminate between lobbyists who represent a single principal part-time and those who represent numerous principals full-time or between lobbyists who will never have occasion to lobby the elected official and those who will have many occasions to do so. Defendants do not respond to these arguments. An independent review of the statute suggests that plaintiffs' portrayal of the prohibition's extensive reach is accurate.

As a second concern, defendants have failed to show that the challenged provision avoids unnecessary abridgment of associational freedoms. They argue that the statute prohibits only a small range of possible contributions by lobbyists to political campaigns: activities conducted at the request or authorization of a partisan candidate or the candidate's committee, such as telephoning potential voters from a candidate's telephone bank or going door-to-door on the candidate's behalf. They emphasize that the statute neither prohibits lobbyists from contributing financially to campaigns nor restricts lobbyists from expressing political views independently

either privately or publicly. In response, plaintiffs contend that the ability to contribute money to a campaign cannot compensate for a blanket prohibition against volunteering their time and energy as private citizens to campaigns of their choice. They also contend that the ability to express political views independently of campaigns cannot compensate for deprivation of the right to associate with others in pursuit of the same political causes.

Under limited circumstances, some abridgment of lobbyists' associational rights has survived close scrutiny. In *Harriss,* 347 U.S. 612, 74 S.Ct. 808, the Supreme Court upheld provisions in the Federal Regulation of Lobbying Act that required the disclosure of lobbying activities. The Court allowed this limited abridgment of lobbyists' rights to help prevent the evil caused by special interest groups "masquerading" before Congress "as proponents of the public weal" where the burden on lobbyists' First Amendment rights was "at most an indirect one resulting from self-censorship...." *Id.* at 626, 74 S.Ct. at 816.

This is not such a limited circumstance. The legislative interests at stake are not comparable: there is no concern in this case that lobbyists will masquerade as the embodiments of the public good. Licensing, registration and reporting requirements in Wisconsin's lobby law discourage lobbyists from operating in secret. *See* Wis.Stat. §§ 13.63– 68. More significant, the act upheld in *Harriss* did not entail a prohibition, or even a limitation, on lobbyists' associational activities. In the federal lobbying act, Congress had "merely provided for a modicum of information from those who for hire attempt to influence legislation or who collect or spend funds for that purpose." *Id.* at 625, 74 S.Ct. at 816.

Defendants argue that any abridgment on lobbyists' associational rights is compensated for by the fact that lobbyists remain free to express political views independently of a campaign. By definition, however, independent activities are not associational. What the statute forecloses to lobbyists is their ability to associate with candidates and their supporters in furtherance of common political goals. *See Citizens Against Rent Control/Coalition for Fair Housing v. Berkeley,* 454 U.S. 290, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981) (right of association protects freedom to individuals to act in concert, as a group, to pursue protected First Amendment activities).

Defendants' argument raises the additional question whether the ability to contribute money to campaigns can be a sufficient surrogate for the right to associate in person with campaigns. Although neither the Supreme Court nor the Court of Appeals for the Seventh Circuit has ever addressed this precise question, the underlying premise of *Buckley,* 424 U.S. 1, 96 S.Ct. 612, is that financial contributions cannot substitute for associational rights. In *Buckley,* 424 U.S. at 29, 96 S.Ct. at 640, the Supreme Court was addressing the constitutionality of contribution ceilings under the Federal Election Campaign Act of 1971, which limit "one important means of associating with a candidate or committee, but leave the contributor free to become a member of any political association and *to assist personally in the association's efforts on behalf of candidates.*" *Id.* at 22, 96 S.Ct. at 636 (emphasis supplied). The Court placed great weight on the importance of the fact that volunteer services were exempted from the Federal Election Act's contribution limitations, 18 U.S.C. § 591(e)(5). *See Buckley,* 424 U.S. at 22, 23 n. 24, 28, 36, 96 S.Ct. at 636, 637 n. 24, 639, 643. The Court found the election act's contribution ceilings to be constitutional in part because Congress did not attempt to limit citizens' volunteering their labor to political campaigns. As the Court emphasized in *Buckley,* First Amendment rights "cannot properly be made to depend on a person's financial ability...." *Id.* at 49, 96 S.Ct. at 649.

Under Wisconsin's law, lobbyists face the same financial contribution ceilings as do other citizens; in addition, they face restrictions on when and under what circumstances they may make financial contributions to campaigns; and they are required to report their lobbying activities. *See* Wis.Stat. §§ 13.61– 68. In addition, they are prevented from volunteering personal services to political associations. This prohibition far surpasses

the contribution limitations that the Court found constitutional in *Buckley*. Whereas *Buckley* endorsed limits on financial contributions in the context of unregulated volunteering, the Wisconsin statute prohibits all contributions of volunteer services in the context of financial contribution limits. *Cf. Fair Political Practices Comm'n*, 25 Cal.3d 33, 599 P.2d 46, 157 Cal.Rptr. 855.

Defendants' final argument is that the prohibition on voluntary services is a necessary corollary to other provisions in Wisconsin's lobby law and that any narrowing of the statute would render the lobby law "less effective and less enforceable." This argument is similar to one rejected by the Supreme Court in *Buckley*, 424 U.S. 1, 96 S.Ct. 612, when it struck the Federal Election Act's independent expenditure limits. In that case, the government argued that "the expenditure limitation was necessary to prevent would-be contributors from avoiding the contribution limitations" by disguising contributions as independent expenditures. The Court rejected the government's argument because attempts to circumvent the act were sanctionable under other provisions in the act. *Id.* at 46–47, 96 S.Ct. at 647–48.

The same principle applies here. In view of the lobby law's existing sanctions against secretive or fraudulent conduct by lobbyists, defendants have not established that a blanket prohibition against volunteering personal services to campaigns is a necessary corollary to the law's other provisions. For example, Wisconsin's lobby law requires lobbyists to obtain licenses, Wis.Stat. § 13.63(1); to be registered with the secretary of state, Wis.Stat. § 13.64; to report their lobby-related activities and expenditures, Wis.Stat. § 13.68; and to observe specific restrictions on their comportment as lobbyists, including restrictions on monetary contributions to campaigns, Wis.Stat. § 13.625. Defendants' major concern appears to be that, in the absence of a direct prohibition, lobbyists will use volunteered personal services as a way to circumvent these other provisions. It seems apparent that the lobby law protects against lobbyists' operating in secret through disclosure requirements that insure that the identity of lobbyists is a matter of public record.

It also seems apparent that, if the legislature perceived a specific threat from lobbyists engaging in volunteering as a way to circumvent limitations on campaign monetary contributions, the legislature could expand its requirements to include the disclosure of such volunteer activities. It goes without saying that, if lobbyists were volunteering "personal" services to an elective official's campaign in their capacities as paid lobbyists, such disguised volunteering would be a reportable activity under the existing provisions in the lobbying act and that, if lobbyists were paid by a principal or paid others to donate personal services to a campaign, such a donation would be reportable under Wis. Stat. §§ 13.625(1)(b) and 11.01(6)(a) as an in-kind contribution of a "thing of merchantable value" subject to contribution limitations, which are enforced with civil and criminal penalties. *See* Wis.Stat. §§ 11.60 and 11.61.

The only question remaining is the appropriate remedy.

### Remedy

■ If the parties challenging a statute are those who desire to engage in the protected activity, the "statute may forthwith be declared invalid to the extent that it reaches too far, but otherwise left intact." *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504, 105 S.Ct. 2794, 2802, 86 L.Ed.2d 394 (1985) (invalidating obscenity statute only insofar as the word "lust" includes normal sexual appetite). Wisconsin's lobby law overreaches insofar as it prohibits lobbyists from volunteering personal services to political campaigns because it does not provide an answer that relates sufficiently to the elimination of the dangers of corruption and the appearance of corruption. This court would overreach its authority were it to attempt to "patch up" a contested provision in an attempt to tailor it more narrowly. *Buckley v. Illinois Judicial Inquiry Board*, 997 F.2d 224, 230 (7th Cir. 1993). Defendants argue against such an approach in any event because of the unforeseeable enforcement costs.

The sensible approach to take is the one proposed by plaintiffs: to invalidate Wisconsin's lobby law only insofar as it prohibits volunteering of personal services by lobbyists

to political campaigns. Such an approach accords entirely with the one endorsed by the United States Supreme Court in *Brockett*, 472 U.S. 491, 105 S.Ct. at 2794. If the legislature continues to perceive a need to regulate the volunteer activities of lobbyists, it remains free to pass a lobby law that focuses more precisely on identified harms.

### ORDER

IT IS ORDERED that

(1) defendants' motion for summary judgment is DENIED; plaintiffs' motion for summary judgment is GRANTED;

(2) the clause in Wis.Stat. § 13.625(1)(b)(3) stating "any other thing of pecuniary value" is declared unconstitutional insofar as it prohibits uncompensated personal services by lobbyists on behalf of candidates for elective state office; and

(3) defendants are enjoined permanently from taking any adverse action against plaintiffs, pursuant to § 13.625(1)(b)(3), if plaintiffs volunteer personal services to candidates for elected office.

The Clerk of Court is directed to enter judgment in favor of plaintiffs and to close this case.